IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JOE PATNODE, an individual,

        Plaintiff,

        v.

SUNRIVER POLICE DEPARTMENT, a
political subdivision of SUNRIVER
SERVICE DISTRICT, CORY RAY
DARLING, in his personal and official
Capacities as Chief of Police for Sunriver
Police Department, MICHAEL WOMER, in
his personal capacity, DEBBIE BAKER, in
her personal and official capacities as
Board Member of the Sunriver Service
District,

        Defendants.

_____

Case No. 6:19-CV-02084-MC

OPINION AND ORDER

**MCSHANE, Judge:**

        Plaintiff Joe Patnode served as a sergeant for the Sunriver Police Department until he was

terminated in June of 2019. In December of 2019, Plaintiff brought the instant action against

Defendants, alleging violations of the First and Fourteenth Amendments and two state

whistleblower statutes. Defendants now move for summary judgment on all four of Plaintiff's

claims. Defs.' Mot. Summ. J., ECF No. 29. Plaintiff also moves for summary judgment, arguing

that he did not fit the statutory definition of "supervisory employee" as a matter of law. Pl.'s

1 – OPINION AND ORDER

Resp. and Cross-mot., ECF No. 38. Because the official job description and employee handbook indicate that Plaintiff's role entailed supervisory duties, Plaintiff's Cross-motion for Summary Judgment, ECF No. 38, is DENIED. Because Plaintiff cannot prove that the reasons proffered by Defendants for his termination are pretextual, Defendants' motion in regard to Plaintiff's First Amendment claim and both of Plaintiff's whistleblower claims is GRANTED. Finally, because Plaintiff had no constitutionally protected property interest in his position, and because Plaintiff was given notice and an opportunity to be heard prior to his termination, Defendants' motion in regard to Plaintiff's Fourteenth Amendment claim is GRANTED.

## BACKGROUND

From 2003 to 2019, Plaintiff served as a sergeant for the Sunriver Police Department ("SPD"), part of the Sunriver Service District ("District"). Patnode Decl. ¶ 2, ECF No. 40. On December 1, 2017, Marc Mills, then Chief of the Sunriver Police Department, discovered that a magnetic vehicle sign had been vandalized, and was yelling about the incident near the front desk of the SPD. Fister Decl. Ex. 1, at 2, ECF No. 32. Mills then walked by Plaintiff and struck him in the chest with the sign, knocking Plaintiff off balance. *Id.* The next day, Officer Tiffany Hughes, who witnessed the incident, reported it to James Fister, the chair of the Sunriver Service District's managing board. Fister Decl. ¶ 3. Mr. Fister then contacted Plaintiff and asked him to document the incident in writing for the board. *Id.* ¶ 4. Initially, Plaintiff was reluctant to discuss the matter. Fister Decl. Ex. 1, at 1. Plaintiff expressed concern that discussing the matter could get him fired because he was an at-will employee. *Id.* However, because he considered Mr. Fister his superior, Plaintiff complied and provided to the board a memorandum summarizing the incident. *Id.* Plaintiff was subsequently asked by the Deschutes County District Attorney to

testify against Chief Mills pertaining to the harassment charge. Patnode Decl. ¶ 12. Plaintiff was also contacted by Chief Mills' attorney, who asked him to sign a civil compromise that would allow Mills to resign instead of being prosecuted. *Id.* ¶ 14. Plaintiff refused to sign the civil compromise and decided to testify. *Id.* ¶ 15. However, Chief Mills pled no contest, and Plaintiff never testified. Pl.'s Resp. and Cross-mot. 5. Chief Mills resigned pursuant to a settlement agreement with the District and was paid three months of severance. *Id.* Defendant Cory Darling replaced Chief Mills as chief of police in July of 2018. Darling Decl. ¶ 2, ECF No. 31.

In October of 2018, the SPD created a lieutenant position between the chief of police and the sergeants. Suppl. Darling Decl. Ex. 1, at 1, ECF No. 51. Plaintiff and Defendant Michael Womer both applied for this position. Defs.' Mot. Summ. J. 6. As part of the selection process, Plaintiff and Defendant Womer interviewed in front of a promotion panel comprised of Defendant Debbie Baker, District Fire Chief Tim Moor, and Bend Police Department Lieutenant Brian Beekman. *Id.* On Nov 1, 2018, Defendant Darling awarded the lieutenant position to Defendant Womer based on the promotion panel's recommendations. *Id.*

On November 11, 2018, Plaintiff received information from his subordinate, Tiffany Hughes, that her husband, Kasey Hughes—who was another officer under Plaintiff's charge—was cheating on her. Downs Decl. Ex. 5, at 4, ECF No. 30. Plaintiff sent Tiffany Hughes home from work due to her emotional state. *Id.* The next day, Plaintiff received a call from Sergeant PJ Beaty, who told Plaintiff that Kasey Hughes had been in a vehicular accident and may have been suicidal. Defs.' Mot. Summ. J. 7. Sergeant Beaty also informed Plaintiff that Defendant Darling was en route to deal with the situation. Downs Decl. Ex. 5, at 4.  Later that day, Plaintiff was contacted by Anchorage police officer and friend of Kasey Hughes, Taylor Webster, who told him that Kasey Hughes had left his post while on duty to take a woman to the hospital. *Id.*

3 – OPINION AND ORDER

Although Plaintiff knew important details regarding Kasey Hughes's substance abuse and marriage problems, he did not report this information or Officer Webster's phone call to his chain of command. Defs.' Mot. Summ. J. 7.

In February of 2019, Defendant Womer began an internal affairs investigation into Plaintiff related to the November 2018 incident and Plaintiff's alleged failure to report his subordinate's misconduct. Downs Decl. Ex. 6, at 1, ECF No. 30. Defendant Womer also investigated Plaintiff's alleged disclosure of confidential information to unauthorized individuals. *Id.* at 1–2. In April of 2019, Defendant Darling found the allegations sustained, noting that Plaintiff "disregarded obvious indicators and reports" of misconduct, failed to disclose information regarding misconduct, and violated directives to keep information confidential. Darling Decl. Ex. 1, at 1–2.

Defendant Darling's "preliminary determination [was] that termination of employment [was] the appropriate disciplinary sanction in this matter." *Id.* at 3. However, Defendant Darling offered Plaintiff the opportunity to appear and present mitigating evidence at a pre-disciplinary meeting before a final decision would be made. *Id.* During this meeting, Plaintiff's attorney requested that Defendant Darling offer Plaintiff a Last Chance agreement that would allow him to continue working as a police officer in exchange for a demotion. Darling Decl. ¶ 5. Defendant Darling eventually offered the agreement to Plaintiff, but Plaintiff refused to sign. Darling Decl. ¶ 7. Defendant Darling terminated Plaintiff's employment on June 6, 2019, citing a loss of trust and numerous policy violations related to the November 2018 incident and Plaintiff's disclosure of confidential information. Darling Decl. Ex. 3, at 5–8.

//

//

4 – OPINION AND ORDER

**STANDARDS**

The court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). An issue is "genuine" if a reasonable jury could return a verdict in favor of the non-moving party. *Rivera v. Phillip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is "material" if it could affect the outcome of the case. *Id.* The court reviews evidence and draws inferences in the light most favorable to the non-moving party. *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 988 (9th Cir. 2006) (quoting *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999)). When the moving party has met its burden, the non-moving party must present "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (quoting FED. R. CIV. P. 56(e)).

**DISCUSSION**

**I. Plaintiff's Cross-motion for Summary Judgment**

Plaintiff argues he was not a "supervisory employee" under the Peace Officer's Bill of Rights ("POBOR") and was therefore entitled to the POBOR's due process protections at the time of his termination. OR. REV. STAT. §§ 236.350–.370 (2021). Alternatively, Plaintiff argues that, because he was not under a collective bargaining agreement, he was entitled to the statutory protections of the POBOR even if he was a "supervisory employee."

**A. Timeliness of Plaintiff's Cross-motion**

Defendants argue that Plaintiff's cross-motion was untimely because it was not filed by the February 4, 2021 deadline for dispositive motions. Defs.' Resp. to Pl.'s Cross-mot. 7, ECF No. 49.  However, Federal Rule of Civil Procedure 60(b)(1) allows the relief of a party from

5 – OPINION AND ORDER

court order due to "mistake, inadvertence, surprise, or excusable neglect." Plaintiff filed timely, stipulated motions to extend the deadlines for filing, which were granted by this Court. *See* Pl.'s Mot. Extension 1, ECF No. 33; Pl.'s Mot. Extension 1, ECF No. 35; Pl.'s Mot. Extension 1, ECF No. 37. Although these extensions were not explicitly for dispositive motions, this Court finds that Plaintiff's mistake was inadvertent and made in good faith. Furthermore, Defendants are not unduly prejudiced by this delay. It is unclear what additional discovery—other than the evidence on which the Defendants have already relied in their Response addressing the substantive merits of the Plaintiff's Cross-motion—would be required in order to address this narrow legal issue. Defs.' Resp. to Pl.'s Cross-mot. 12–19. Accordingly, this Court will consider Plaintiff's Cross-motion for Summary Judgment.

### B. Plaintiff's Legal Status as a "Supervisory Employee"

The POBOR provides public employees facing disciplinary action certain due process protections, including the requirement of just cause, notice, and an opportunity to be heard. OR. REV. STAT. § 236.360(2), (4), (5) (2021). The POBOR also explicitly exempts certain classes of employees—most notably, "supervisory employees"—from its coverage, indicating that its protections "do not apply to actions taken against public safety officers who are […] [s]upervisory employees […] where a collective bargaining agreement is in effect with their public employer." OR. REV. STAT. § 236.370(5) (2021). The statute defines a "supervisory employee" as "any individual having authority in the interest of the employer to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action." OR. REV. STAT. § 243.650(23)(a) (2021). Furthermore, the authority exercised by a

"supervisory employee" must necessarily involve the use of "independent judgment" and not be "merely routine or clerical in nature." *Id.*

As a sergeant, Plaintiff was a "supervisory employee" as defined by the POBOR. The District's official description of the sergeant position—which Plaintiff signed—is laden with indications that sergeants had the authority to "responsibly direct" other employees with the use of "independent judgment." Suppl. Darling Decl. Ex. 2, at 1–2; Downs Decl. Ex. 1, at 20. The document describes the position as a "working supervisory position" with "considerable latitude for independent actions and decisions." This is further supported by Defendant Darling's reorganization memorandum, which states that "the proposed new duties of the sergeant will reflect a strong emphasis on frontline supervision." Suppl. Darling Decl. Ex. 1, at 1. The District's position description also mentions several essential duties of the sergeant: supervising assigned employees and making recommendations on personnel actions; interviewing citizens regarding complaints against assigned employees, directing the investigation, and reviewing findings for validity; and conducting inquiries and investigations into complaints of law and policy violations. Suppl. Darling Decl. Ex. 2, at 2. These duties demonstrate that sergeants played a large role in disciplining and adjusting the grievances of other employees. Furthermore, the fact that sergeants had the ability to direct investigations into policy violations of other employees speaks to the significant level of involvement that sergeants had in this process.

Despite this, Plaintiff argues he was not a "supervisory employee" because the SPD's creation of the lieutenant position effectively stripped the sergeants of any notable supervisory functions; however, this appears to be a mischaracterization of the circumstances surrounding the creation of the lieutenant position. Pl.'s Resp. and Cross-mot. 13. In his reorganization memorandum, Defendant Darling stated that sergeants had been "overburdened with

7 – OPINION AND ORDER

administrative duties" which had resulted in ineffective supervision. Suppl. Darling Decl. Ex. 1, at 1. In response, the SPD created the lieutenant position in order to relieve the sergeants of these administrative duties and provide them with *more* opportunities to supervise, not fewer. Darling Decl. Ex. 1, at 2. The supervisory nature of the sergeant position is further bolstered by Plaintiff's own admissions during his deposition, where he stated that he was a supervisor of other officers—even off duty—and that, as a supervisor, it was his responsibility to "act on it" if another employee committed misconduct. Downs Decl. Ex. 1, at 12. Because SPD sergeants were expected to perform numerous supervisory duties, Plaintiff was a "supervisory employee" as defined by the POBOR.

### C. Plaintiff's Entitlement to the POBOR's Due Process Protections as a "Supervisory Employee" Who is Not Under a Collective Bargaining Agreement with their Employer

Plaintiff also argues that, even if he was a "supervisory employee," he was nonetheless entitled to the POBOR's statutory protections. Pl.'s Resp. and Cross-mot. 16–20. Plaintiff focuses on the POBOR provision that exempts from coverage "[s]upervisory employees […] where a collective bargaining agreement is in effect with their public employer." OR. REV. STAT. § 236.370(5). Plaintiff interprets this to mean that supervisory employees are only exempted from statutory protections when they themselves have entered into a collective bargaining agreement with their employer. Pl.'s Resp. and Cross-mot. 17; OR. REV. STAT. § 236.370(5) (2021). This is a misinterpretation. Under this reading, the statute would exempt from coverage a class of employee that, according to the legislature, cannot exist.

The Public Employees Collective Bargaining Act ("PECBA"), codified at ORS sections 243.650 to 243.670, grants public employees the right to enter into a collective bargaining

8 – OPINION AND ORDER

agreement. "Public employees have the right to form, join and participate in the activities of labor organizations of their own choosing for the purpose of representation and collective bargaining with their public employer on matters concerning employment relations." OR. REV. STAT. § 243.662 (2021). In addition to granting these rights to public employees, the legislature distinguished public employees from supervisory employees, stating that a "'[p]ublic employee' means an employee of a public employer but does not include … supervisory employees or managerial employees." OR. REV. STAT. § 243.650(19) (2021). Because the legislature expressly granted to public employees the right to enter into a collective bargaining agreement while declaring that supervisory employees were, as a matter of law, not public employees, the legislature did not intend for supervisory employees to be able to enter into collective bargaining agreements.[1]

Thus, because there is legally no such thing as a supervisory employee who has entered into a collective bargaining agreement with their employer, the POBOR is correctly read to exclude supervisory employees where a collective bargaining agreement is in effect between *their subordinates* and their employer. Accordingly, the POBOR's due process protections do not apply to Plaintiff as a "supervisory employee."

## II. Defendants' Motion for Summary Judgment

### A. First Amendment Claim

Plaintiff asserts that his report to the board regarding the 2017 incident with Chief Mills and his decision to reject the civil compromise and testify against Chief Mills were protected by the First Amendment. Pl.'s Compl. ¶ 48, ECF No. 1. Plaintiff argues that his termination, the

---

[1]Plaintiff himself appears to have shared the belief that he was not entitled to POBOR's protection. Plaintiff signed an employee handbook containing a provision that stated his employment was at-will, and Plaintiff confirmed in his deposition that he was aware that this meant the SPD could fire him without cause.

SPD's decision to promote Defendant Womer to lieutenant, the SPD's denial of overtime to Plaintiff, and Chief Darling's decision to investigate Plaintiff were retaliation for these protected acts. *Id.* at 50. In order to prevail on a First Amendment retaliation claim against Defendants, Plaintiff must demonstrate that (1) he engaged in constitutionally protected speech; (2) Defendants took adverse employment action against him; and (3) his protected speech was a "substantial or motivating" factor for the adverse action. *Marable v. Nitchman*, 511 F.3d 924, 929 (9th Cir. 2007).

The requirement of protected speech balances a public employer's interest in "promoting the efficiency of the public services it performs through its employees" and a public employee's "First Amendment right [that they] would otherwise enjoy as citizens to comment on matters of public interest." *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty., Illinois*, 391 U.S. 563, 568 (1968). A public employee's speech is protected when (1) the speech involves a matter of public concern; and (2) the individual spoke in their capacity as a private citizen—not a public employee. *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006).

Speech involves a matter of public concern if it relates "to any matter of political, social, or other concern to the community" such as "the functioning of government[,] … misuse of public funds, wastefulness, and inefficiency in managing and operating government entities." *Connick v. Myers*, 461 U.S. 138, 146 (1983); *Posey v. Lake Pend Orielle Sch. Dist. No. 84*, 546 F.3d 1121, 1130 (9th Cir. 2008). While speech that merely relates to "individual personnel disputes and grievances" is typically not of public concern because such speech does not relate "to the public's evaluation of the performance of governmental agencies," certain speech can warrant First Amendment protections even though it may relate to a "personnel dispute or grievance." *Coszalter v. City of Salem*, 320 F.3d 968, 973 (9th Cir. 2003) (quoting *McKinley v.*

*City of Eloy,* 705 F.2d 1110, 1114 (9th Cir.1983)); *see also Posey,* 546 F.3d at 1130 (ruling that sexual harassment between teachers at a school and other school safety issues, as well as the administration's failure to address these issues, were matters of public concern); *Freitag v. Ayers*, 468 F.3d 528, 545 (9th Cir. 2006) (ruling that sexual harassment of female prison guards by inmates was a matter of public concern).

The speech at issue must also be made as a private citizen, not a public employee. Although speech does "not lose First Amendment protection simply because [it] concern[s] the subject matter of the Plaintiff's employment," speech "which owes its existence to an employee's professional responsibilities" is not protected. *Freitag,* 468 F.3d at 545; *Garcetti*, 547 U.S. at 421. Speech is made in the course of the speaker's official duty when it is the "product of 'performing the tasks the employee [is] paid to perform'" *Hagen v. City of Eugene*, 736 F.3d 1251, 1257 (9th Cir. 2013) (quoting *Marable*, 511 F.3d. at 933). When determining the scope of an employee's job duties in a hierarchical atmosphere like law enforcement, courts also consider whether "the employee confined his communications to his chain of command." *Dahlia v. Rodriguez*, 735 F.3d 1060, 1075 (9th Cir. 2013). If an employee takes their concerns to individuals outside of their chain of command, "those external communications are ordinarily not made as an employee, but as a citizen." *Id.*

Upon a finding that a plaintiff (1) engaged in protected speech and (2) suffered an adverse employment action, a plaintiff is then required to show their protected speech was a "substantial or motivating factor" for the adverse employment action. *Coszalter*, 320 F.3d at 977. There are three ways a plaintiff can demonstrate this causal link: (1) evidence regarding the proximity in time between their protected speech and the adverse employment action; (2) evidence that the plaintiff's employer "expressed opposition to the plaintiff's protected speech";

11 – OPINION AND ORDER

and (3) evidence that plaintiff's employer's proffered explanations for the adverse employment action were "false and pretextual." *Id.* While proximity in time is not dispositive, a time span of just three months between the protected speech and alleged retaliation can be too long to give an inference of retaliation. *Erickson v. Pierce County*, 960 F.2d 801, 803 (9th Cir. 1992) (upholding judgment for employer when adverse action occurred only three months later).

There are genuine issues of material fact as to whether Plaintiff's report to the board regarding the incident with Chief Mills and his decision to testify against Chief Mills were protected under the First Amendment. Pl.'s Compl. ¶ 24, ECF No. 1. Although the incident could be characterized as an individual personnel dispute or grievance, a jury could reasonably find the aggressive on-duty behavior of a chief of police—who interacts with the community and influences department policies and methods—to be a matter of public concern relating "to the public's evaluation of the performance of governmental agencies." *Coszalter*, 320 F.3d at 973. A jury could also find that, when Plaintiff made the decision to testify, he did so as a private citizen, not a public employee. The question requires a deep, fact-intensive inquiry into the scope of Plaintiff's employment, including whether it was Plaintiff's "professional duty" to report such incidences, and whether consorting with Debbie Baker—a district board administrator— constituted communications outside Plaintiff's chain of command. *Id.*

It is undisputed that Plaintiff suffered adverse employment actions: (1) Plaintiff was denied overtime pay and compensation for trainings; (2) Plaintiff was passed over for promotion; (3) Plaintiff was investigated; and (4) Plaintiff was terminated. *Id.* ¶ 50. However, Plaintiff has not met his burden of introducing evidence from which a jury could infer that his speech—even if protected—was a substantial or motivating factor in these adverse employment actions.

First, Plaintiff has not proven that the SPD's or the District's denial of trainings and overtime was substantially motivated by Plaintiff's speech. On January 16, 2018, Plaintiff requested certain employment benefits from Defendant Baker, and Baker's response was "that's not the way it works." Downs Decl. Ex. 1, at 32. Because this incident occurred less than a month after Plaintiff's alleged protected activity, Plaintiff has proven proximity in time. Plaintiff has also established that Defendant Baker was opposed to his decision to testify. Pl.'s Resp. and Cross-mot. 5, ECF No. 38. However, Defendant Baker had a legitimate reason for not granting Plaintiff's request for more employment benefits: she did not possess the authority to grant Plaintiff's request—even if she had wanted to. The employee handbook states that only the Department Chief or Managing Board has the authority to enter into any employment contracts with public employees. Downs Decl. Ex. 2, at 1. Furthermore, Plaintiff stated that he did not believe there was any relationship between his decision to testify and the District's refusal to provide him with benefits. Downs Decl. Ex 1, at 32.

Plaintiff also mentions the denial of his January 2019 request to attend several trainings. Downs Decl. Ex. 1, at 36. Plaintiff does not know specifically who denied the request, and he concedes that he has no factual information supporting the allegation that he was denied these trainings for retaliatory reasons. *Id.* The Court cannot effectively evaluate a retaliation claim without knowing whom it involves.

Plaintiff further claims that he asked Defendant Darling for overtime, but he does not remember when. *Id.* Although his request was denied, Plaintiff thinks it was "speculation on [his] part" to assume that the denial was motivated either by his report of the November 2018 incident or his decision to testify against Chief Mills. *Id.* at 37.

13 – OPINION AND ORDER

Plaintiff has failed to prove that his speech was a substantial or motivating factor in any of these instances of denial of employment benefits—and based on his deposition, Plaintiff appears to believe that most of these instances were *not* retaliatory. *Id.* at 35–37. Most importantly, Plaintiff cites no authority as to why he was entitled to these benefits in the first place, nor does he provide any examples of them being provided to others in his position.

Second, Plaintiff has failed to prove that his protected speech was a substantial or motivating factor in Defendant Darling's decision to promote Defendant Womer to lieutenant instead of Plaintiff. Both Plaintiff and Defendant Womer appeared in front of a promotion panel comprised of Defendant Baker, District Fire Chief Tim Moor, and Bend Police Lieutenant Brian Beekman. Downs Decl. Ex. 1, at 35.  All three members of the panel ranked Defendant Womer higher than Plaintiff. *Id.* at 35. It is unclear how Plaintiff's protected speech would have been a substantial factor in this decision, since Plaintiff believes that Moor and Beekman were objective in their evaluations and that Defendant Darling had no reason to retaliate against him. *Id.* at 25, 35. Plaintiff claims Defendant Baker's negative evaluation was influenced by his protected speech; however, because Defendant Baker reached the same conclusion as three individuals who lacked any reason to retaliate against Plaintiff, the Court finds that Plaintiff has not proven that he would have been promoted "but for" his protected speech.

Third, Plaintiff has not proven that his speech was a substantial or motivating factor in Defendant Womer's alleged denial of due process protections during the investigation into Plaintiff. Plaintiff believes he received adequate due process during Defendant Womer's investigation other than the fact that he was not provided with audio transcripts prior to his second interview. Downs Decl. Ex 1, at 38, 42. Since the second interview never occurred, it is unclear exactly what protections Plaintiff believes he was denied. *Id.*

14 – OPINION AND ORDER

Finally, Plaintiff has not proven that Defendant Darling's decision to investigate and eventually terminate Plaintiff was in retaliation for Plaintiff's speech. The SPD launched their investigation into Plaintiff in February 2019, and they terminated him in April 2019. Defs.' Mot. Summ. J. 9–10. Each of these events occurred at least a year after Plaintiff filed the incident report and decided to testify against Chief Mills. Pl.'s Resp. and Cross-mot. 5, 10. A time span of one year is too long to grant Plaintiff an inference of retaliation based on proximity in time alone. Furthermore, Plaintiff has also not proven that the individuals involved in his investigation and termination—Defendants Darling and Womer—were opposed to his speech. In his deposition, Plaintiff stated that he did not think Defendant Darling had any motive to retaliate against him. Downs Decl. Ex. 1, at 4. Furthermore, Defendant Darling was not involved in the incident with Chief Mills, and actually benefited from Mills' resignation in that he was made chief of police. *Id.* Plaintiff claims that Defendant Womer—the officer in charge of Plaintiff's investigation— had a motive to retaliate against Plaintiff because Defendant Womer had frequent disagreements with Plaintiff and was personal friends with Chief Mills. *Id.* However, Defendant Womer himself never told Plaintiff that he was friends with Chief Mills or that he was upset with Plaintiff over the incident, and Plaintiff has no factual information to support his assertions. *Id.* at 5–6. Most detrimental to Plaintiff's claim, however, is the fact that Defendant Darling had a legitimate reason for investigating and terminating Plaintiff that was unrelated to Plaintiff's decision to report the incident or testify against Chief Mills. Plaintiff failed to disclose important information regarding the actions and ongoing substance abuse of his subordinate, Kasey Hughes—who he knew was suicidal—that could have helped Defendant Darling assess the situation more efficiently. Downs Decl. Ex 5, at 4. Plaintiff then disclosed to unauthorized individuals confidential information regarding the ensuing investigation into Kasey Hughes' behavior. As a

15 – OPINION AND ORDER

result, Defendant Darling lost trust in Plaintiff and made the decision to terminate him. Darling

Decl. Ex. 3, at 10. Instead of proving that Defendants' reasons for the adverse employment

actions were pretextual, Plaintiff has in fact done the opposite by acknowledging that he *did*

commit the violations for which he was terminated, and that he felt that demotion would have

been a fair punishment.[2] Downs Decl. Ex. 1, at 24.

Plaintiff has not produced sufficient evidence from which a jury could reasonably infer

that the adverse employment actions he suffered were in retaliation for his decision to report the

incident or testify against Chief Mills. There is no evidence that anyone involved in Plaintiff's

investigation or termination was opposed to his decisions, and Defendants had legitimate reasons

for taking adverse employment actions against Plaintiff. Because Plaintiff has not proven that the

reasons proffered by Defendants were pretextual, his First Amendment retaliation claim fails,

even though issues of material fact remain as to whether his speech was protected.

### B. Fourteenth Amendment Claim Alleging Deprivations of Procedural and Substantive Due Process[3]

Plaintiff alleges deprivations of his procedural and substantive due process rights under

the Fourteenth Amendment. Downs Decl. Ex. 1, at 24. Plaintiff argues he was deprived of

procedural due process because Defendants terminated him without providing him with

investigation materials, and without just cause. Pl.'s Resp. and Cross-mot. 29. Pertaining to

substantive due process, Plaintiff argues that Defendants "violated [his] liberty interest by falsely

and maliciously branding him as untruthful, … which acts as a functional blacklist in the field of

law enforcement." *Id.* at 32.

---

[2] Defendant Darling offered Plaintiff a "Last Chance Agreement" that would allow Plaintiff to retain his employment in exchange for a demotion, and Plaintiff refused to sign it. Downs Decl. Ex. 1, at 24.

[3] Plaintiff initially filed a claim under the equal protection clause but withdraws it. Pl.'s Resp. and Cross-mot. 28.

### 1. Plaintiff's Constitutional Property Interest

Plaintiff argues that he had a constitutionally protected property interest in his continued employment, and that Defendants violated his Fourteenth Amendment rights when they terminated him absent certain due process protections, including just cause. Pl.'s Compl. ¶ 63. A procedural due process claim has three elements: (1) a liberty or property interest protected by the Constitution; (2) a deprivation of the interest by the government; and(3) lack of process. *Portman v. Cty. Of Santa Clara*, 955 F.2d 898 (9th Cir. 1993).

The Constitution protects property interests; it does not create them. *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972). Property interests are created by "existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.* Put simply, for an individual to have a "constitutionally protected interest in continued employment," they must have more than an abstract desire or a unilateral expectation of continued employment—state law must create a "reasonable expectation or a 'legitimate claim of entitlement to it.'" *Brady v. Gebbie*, 859 F.2d 1543, 1547–48 (9th Cir. 1988) (quoting *Roth*, 408 U.S at 577). In Oregon, such legitimate claims of entitlement arise "solely from statutes or . . . regulations adopted pursuant to a delegation of authority." *Id.* at 1549 (quoting *Papadopoulous v. Oregon State Bd. of Higher Educ.*, 511 P.2d 854, 872 (Or. App. 1973)). "If, under state law, employment is at-will, then the claimant has no property interest in the job." *Portman*, 995 F.2d at 904. If a court determines that a plaintiff has no constitutionally protected property interest in their employment, the court "need not analyze whether or not the circumstances of his termination constituted an impermissible deprivation" of procedural due

process rights. *Ignacio v. Cnty. of Hawaii Police Dept.*, 585 Fed. App'x. 645, 646 (9th Cir. 2014).

In *Brady*, the Ninth Circuit addressed whether a public employee had a constitutionally protected interest in his position as a state medical examiner. *Brady*, 859 F.2d at 1551. The *Brady* plaintiff argued that, because he had a constitutionally protected interest in his position, his public employer violated his Fourteenth Amendment rights when they terminated him without due process. *Id.* at 1547. Recognizing that constitutionally protected interests arise *only* from statutes or regulations, the *Brady* court looked to Oregon law for any statutes that limited the grounds upon which the plaintiff could be discharged from public employment—such as the requirement of just cause and the right to a hearing. *Id.* at 1548–49. The court found that Oregon law, while it created such entitlements for certain public employees, actually excluded state medical examiners from receiving those entitlements. *Id.* Therefore, the *Brady* court ruled that the plaintiff did not have a constitutionally protected interest in his position. *Id.*

The Court likewise finds that Plaintiff had no constitutionally protected property interest in his position as a sergeant for the Sunriver Police Department, and the analysis need not go any further. As was the case in *Brady*, state law explicitly excludes Plaintiff from being entitled to the job protections that would create such an interest. The POBOR—which is the only statutory support advanced by Plaintiff—is a state law that indisputably creates a constitutionally protected property interest for public employees; however, as noted above, Plaintiff was statutorily exempt from the POBOR's protections as a matter of law due to his status as a "supervisory employee." The employee handbook similarly states that Plaintiff's position was "at-will." Downs Decl. Ex. 2, at 1. This handbook was published by the District, which qualifies it as a "regulation adopted pursuant to a statutory delegation of authority," and one that appears

18 – OPINION AND ORDER

to adhere to state law. *Id.* It follows that Oregon state law creates no legitimate entitlement to continued employment, and in fact explicitly exempts from such entitlement the class of employees to which Plaintiff belongs. Furthermore, because Plaintiff signed the employee handbook and stated in his deposition that he *knew* he was an at-will employee, Plaintiff had no reasonable expectation—subjective or objective—of continued employment. *Id.* Therefore, Oregon state law does not create a constitutionally protected interest in Plaintiff's continued employment, and Plaintiff was not entitled to procedural due process protections—such as the requirement of just cause—surrounding his termination. Accordingly, the Court need not analyze whether the reasons for termination proffered by Defendants constituted just cause, and Plaintiff's Fourteenth Amendment procedural due process claim fails.

### 2. Plaintiff's Constitutional Liberty Interests

Even if an individual has no constitutionally protected property interest in their continued employment, they still have the right to "the freedom to work and earn a living" as a liberty interest protected by the Fourteenth Amendment. *Bollow v. Fed. Rsrv. Bank of San Francisco*, 650 F.2d 1093, 1100 (9th Cir. 1981). If the government terminates an individual's employment "for reasons that might seriously damage [their] standing in the community," the individual is entitled to "notice and a hearing to clear [their] name" in order to avoid "unfair or mistaken exclusion" from the profession and "make sure that an injustice is not done." *Id.*; *Goss v. Lopez*, 419 U.S. 565, 579–80 (1975) (quoting *Jablon v. Trs. of California State Colleges*, 482 F.2d 997, 1000 (9th Cir. 1973)). To implicate these requirements, "the reasons for dismissal must be sufficiently serious to 'stigmatize' or otherwise burden the individual so that [they are] not able to take advantage of other employment opportunities." *Bollow*, 650 F.2d at 1101. For example, accusations that involve dishonesty or immorality can qualify, while mere accusations of

"incompetence and inability to 'get along' with coworkers" fall short of this threshold. *Id.* If the reasons for termination are "sufficiently serious," then the fundamentals of due process require that, prior to the final decision being made, the individual be "informed that the matter is pending [so they] can choose for [themselves] whether to … contest." *Goss*, 419 U.S. at 579, 582.

Plaintiff's termination letter states that his superiors lost trust in his ability to act as a supervisor. Darling Decl. Ex. 3. Because the Court finds that the record demonstrates Plaintiff was informed of the pending investigation and the accusations against him, and Plaintiff was given ample opportunity to be heard, it is unnecessary to analyze whether the reasons given by Defendants for Plaintiff's termination were "sufficiently serious" to foreclose Plaintiff from working in law enforcement. In February of 2019, Plaintiff was informed of the SPD's investigation into his conduct and provided a detailed summary of the specific conduct that was under investigation. Downs Decl. Ex. 6. Upon completion of the investigation, the SPD provided Plaintiff with notice of the charges against him. Darling Decl. ¶4; Darling Decl. Ex. 1, at 1. Prior to the final disciplinary decision, Plaintiff met with Chief Darling, the final decisionmaker, to present evidence in his defense. Darling Decl. Ex. 1, at 3. At the meeting, Chief Darling offered Plaintiff an agreement that would have allowed him to remain employed in exchange for demotion—which Plaintiff refused. Darling Decl. Ex. 1, at 1; Downs Decl. Ex. 1, at 42. Most importantly, Plaintiff was represented by counsel during every identifiable critical stage of the disciplinary process. Downs Decl. Ex. 1, at 42.

Plaintiff has provided countless rejection letters from public employers demonstrating his unfortunate difficulty securing employment since his termination. Patnode Decl. Exs. 1–11, ECF No. 40. However, the Constitution does not preclude public employers from refusing to hire Plaintiff—even if the employers were to do so based on determinations made surrounding

20 – OPINION AND ORDER

Plaintiff's dismissal from the Sunriver Police Department. The Constitution only requires that Plaintiff be given notice and an opportunity to be heard so that these determinations—in the event they are "sufficiently serious" to have this preclusive effect—are not made mistakenly or unilaterally. The Court finds that the due process afforded to Plaintiff by the SPD during the disciplinary process was more than sufficient to achieve these constitutional objectives. Accordingly, Defendants did not violate Plaintiff's constitutional liberty interests, and Plaintiff's Fourteenth Amendment substantive due process claim fails.

### C. Whistleblower Claim

Plaintiff argues that Defendants violated the Oregon Whistleblower Protection Act, codified at ORS 659A.199 and ORS 659A.203. Under ORS 659A.203, a statutory claim is created "when an employer 'retaliates against an employee … who has in good faith reported information that the employee believes is evidence of a violation of a state or federal law, rule or regulation.'" OR. REV. STAT. § 659A.199 (2021). Similarly, ORS 659A.230 "prohibits employers from taking adverse action, including discharging, demoting, suspending, discriminating, or retaliating against an employee in any manner based on an employee's good faith reporting of a violation of federal or state law." OR. REV. STAT. § 659A.230 (2021). In order to establish a prima facie case for retaliation under these statutes, Plaintiff must show that (1) he engaged in protected activity; (2) he was thereafter subjected by his employer to an adverse employment action; and (3) there is a causal link between the protected activity and the adverse employment action. *Brunozzi v. Cable Commc'ns, Inc.*, 851 F.3d 990, 998 (9th Cir. 2017).

Plaintiff alleges several adverse employment actions: (1) Defendant Baker's and Defendant Darling's denial of various employment benefits; (2) Defendant Womer's violation of Plaintiff's due process rights during Plaintiff's investigation; (3) Defendant Darling's decision to

21 – OPINION AND ORDER

promote Defendant Womer to lieutenant over Plaintiff; and (4) Defendant Darling's decision to investigate and eventually terminate Plaintiff. Pl.'s Compl. ¶ 50. Because this Court has determined that genuine issues of material fact remain as to whether Plaintiff engaged in protected activity, the analysis hinges on the causation element. To prove causation, a plaintiff must show that, but for the protected activity, they would not have been fired. *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1064–65 (9th Cir. 2002). Under the burden-shifting framework used by the Ninth Circuit, if a defendant puts forth a nondiscriminatory reason for the unemployment action, the burden shifts to the plaintiff "to prove that the defendant's nondiscriminatory reason is mere pretext." *Id.* at 16. To survive summary judgment, a plaintiff need put forth "very little evidence of discriminatory motive." *Id.* In fact, evidence based on the adverse employment action's temporal proximity to the plaintiff's protected activity alone "can be sufficient to let the issue go to the jury, even in the face of the alternative reasons proffered by the defendant." *Id.* at 17. Evidence demonstrating "significant and rapid changes in an employee's evaluations, combined with testimony from the employee and from coworkers that the evaluations lack credence" can further prove pretext—especially when the employer fails to identify any conduct that would warrant the change. *Id.*

This Court addressed this question during its analysis of Plaintiff's First Amendment Claim and sees no reason why the same analysis of the same facts would yield a different result in the current context of state whistleblower statutes. Because Plaintiff has failed to put forth evidence from which a reasonable jury could infer that the reasons proffered by Defendants were pretextual, Plaintiff's claim under the Oregon Whistleblower Protection Act also fails.

//

//

22 – OPINION AND ORDER

**CONCLUSION**

Plaintiff's Cross-motion for Summary Judgment, ECF No. 38, is DENIED. Defendants'

Motion for Summary Judgment, ECF No. 29, is GRANTED with respect to all four of Plaintiff's

claims.

IT IS SO ORDERED.

DATED this 19th day of October, 2021.


_____/s/ Michael J. McShane_____
Michael McShane
United States District Judge

23 – OPINION AND ORDER